# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **Ayman Al-Hendy, M.D., Ph.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:11-1201** |
| | ) | **Judge Sharp** |
| **Meharry Medical College, Russell E.** | ) | |
| **Poland, Peter J. Dolce, and James E.K.** | ) | |
| **Hildreth,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the Court are: (1) Plaintiff's Motion for Partial Summary Judgment (Docket No. 31); (2) Defendants' Motion for Summary Judgment (Docket No. 38); and (3) Defendant's Motion to Strike (Docket No. 49). Those motions have been fully briefed by the parties and are ripe for ruling.

## I. FACTUAL BACKGROUND

In support of their respective Motions for Summary Judgment, the parties have submitted 188 paragraphs of supposedly undisputed material facts. What follows is a summary of the pertinent facts that place this controversy in perspective. These facts will be expanded upon where necessary for purposes of the legal discussion.

Plaintiff is a licensed medical physician, specializing in obstetrics and gynecology. In addition to his M.D., Plaintiff has a Ph.D. in molecular biology. He is an Egyptian national and a Muslim.

In 2004, Dr. Montgomery-Rice recruited Plaintiff to be the Scientific Director of the

1

Women's Health Research Center ("Women's Center") at Meharry Medical College ("Meharry"). That invitation was declined. However, Dr. Montgomery-Rice renewed the offer and, on September 17, 2007, Plaintiff was hired by Meharry as Vice-Chair in the Department of Obstetrics and Gynecology ("Ob/gyn department") and as Scientific Director of the Women's Center. Initially, Plaintiff reported to Dr. Montgomery-Rice, but his direct supervisor was Dr. Gloria Richard-Davis, then Chair of the Ob/gyn department.

At the time of his hiring, Plaintiff's base salary was $298,000. The terms of his employment at Meharry were contained in a written contract that allocated his time as follows: 30% clinical, 30% as Vice-Chair, and 40% research. Plaintiff was responsible for generating funding through grants for the research component of his compensation.

Effective July 1, 2005, Dr. Montgomery-Rice recruited Defendant James E. K. Hildreth from Johns Hopkins University to head Meharry's Center for AIDS Health Disparities Research ("HIV Center"). Dr. Hildreth was a professor of pharmacology at Johns Hopkins, a prominent HIV researcher, and had served as Chief of the Division of Research in a temporary assignment at the National Center for Minority Health and Health Disparity. He is African-American and not of the Muslim faith. When Plaintiff joined Meharry, Dr. Hildreth was the Program Director of the Research Centers in Minority Institutions ("RCMI") grant. That grant, issued by the National Institutes of Health ("NIH"), funded the Women's Center.

In 2008, Plaintiff, Dr. Hildreth, and several other faculty members at Meharry drafted a proposal for a large NIH translational research grant. In November 2008, Meharry submitted its application, in which Plaintiff and Dr. Hildreth were appointed by Dr. Rice-Montgomery to serve in administrative leadership positions as Co-Principal Investigators ("Co-PIs"). If awarded, the

grant would be the largest monetary research grant ever received by Meharry.

In June 2009 Meharry received verbal notification that it was going to be awarded a $22 million grant from the NIH for translational research. Written notice followed in September 2009. That grant became known as the Meharry Clinical and Translational Research Center Grant ("the MeTRC Grant"). Fallout from the receipt of the grant, and more specifically, Plaintiff's removal from the position as Co-PI is at the center of this litigation.

Defendants claim that immediately upon receiving verbal notice from the NIH of the award of the grant, Plaintiff began exhibiting aggressive behavior towards his colleagues in an effort to control most aspects of the grant. Among other things, this included (1) accusing Dr. Hildreth and Dr. John Murray, acting head of the Participant and Clinical Interactions Resources ("PCIR"), of grant violations and scientific misconduct; (2) disagreeing with Dr. Hildreth and Dr. Russell E. Poland, Vice President for Research, over actions needed in relation to the grant; (3) objecting to the use of funds from the MeTRC Grant to support Meharry's HIV Center, even though Defendants claim that the prior institutional grants Meharry had for its HIV Center and Clinical Research Center were rolled up into the MeTRC Grant; (4) repeatedly revisiting issues that had previously been resolved; and (5) airing internal grievances with the NIH during conference calls that led to the NIH complaining to Meharry about apparent strife regarding the grant.

Defendants assert that in November 2009, the situation got to the point that Meharry President Wayne Riley had a dinner meeting with Plaintiff and Drs. Murray, Hildreth, and Poland to discuss some of the problems they were encountering and how to move forward. Dr. Poland also met with Plaintiff. On November 9, 2009, Dr. Poland reported back that the "discussion was cordial," that he "empathized with [Plaintiff's] supposed dilemma," that he thought Plaintiff

understood most of the concerns, but that he did not believe Plaintiff "fully appreciates the leadership responsibility that comes with his being a Co-PI on a program grant such as the MeTRC." (Docket No. 41-1 at 156).

Defendants contend that, notwithstanding Dr. Poland's meeting, Plaintiff's inappropriate behavior continued. They assert that in January 2010 Plaintiff continued to criticize Dr. Murray's leadership of the PCIR, even in front of staff. They also claim that he essentially called Dr. Hildreth a liar, disparaged Dr. Poland, and stuck his hand in Dr. Hildreth's face during a conference call with the NIH.

Plaintiff casts an entirely different light on the facts alleged by Defendants. For example, he claims that he did not try to micro-manage the MeTRC Grant or Dr. Murray. Rather, pursuant to the terms and conditions of the grant, it was Plaintiff's duty to supervise the PCIR, but Dr. Poland and Dr. Murray were not cooperating with Plaintiff's attempts to address the deficiencies with the PCIR. He further asserts that they usurped his authority and attempted to assume control of the PCIR. Even though Dr. Poland had no role under the terms of the grant, he went so far as to send an email to Dr. Hildreth and Plaintiff telling them that he would get the PCIR up and running and that the PCIR staff would be instructed to respond to requests only from Dr. Murray. Moreover, Dr. Murray's role was to be temporary until a magnet scientist could be found to take the role of Director of the PCIR, and Dr. Hildreth and Plaintiff ultimately agreed that Dr. Murray was not working out as Director.

As for the dinner, Plaintiff claims that it was in celebration of the receipt of the MeTRC Grant. He also claims that any alleged problems were not discussed with him at that dinner.

With regard to the alleged misuse of funds, Plaintiff claims that he was trying to implement

the MeTRC Grant as it was written and as approved by the NIH.  Likewise, his questions regarding certain billing practices were entirely proper and in accordance with the terms of the grant.

As for the meeting with Dr. Poland on November 6, 2009, Plaintiff claims it was not the cordial meeting described.  Rather, Dr. Poland entered Plaintiff's office with no prior notice, threatened him, and insulted him, his wife, and his religion.

With regard to the allegations that the NIH officials complained about the apparent strife and acrimony on conference calls, Plaintiff claims that this was not of his making.  Rather the strife and acrimony were the result of Defendants' failures to comply with the terms and conditions of the MeTRC Grant.  Further, if concerns were actually raised by the NIH, they were not communicated to Plaintiff, even though he was the contact PI on the MeTRC Grant.

Finally, in regard to the alleged "uncontrollable behavior" during the January 21, 2010 call, Plaintiff flatly denies the allegations.  He claims that he merely told NIH officials about the challenges he was facing in trying to implement the PCIR procedures, and denies that he stuck his hand in Dr. Hildreth's face.

Whatever actually occurred, on February 9, 2010, Dr. Hildreth sent an email to Meharry's interim Dean of Medicine, Dr. Billy Ballard, requesting a meeting to discuss his intent to resign as Co-PI on the MeTRC Grant.  That same day, he also had a meeting with Drs. Ballard and Poland about his intent to resign.  Thereafter, Dr. Hildreth had a meeting with Dr. Poland and President Riley, during which President Riley asked Dr. Hildreth to remain on the MeTRC Grant as the sole PI.

On March 1, 2010, Drs. Poland and Ballard met with Plaintiff requesting that he resign as Co-PI on the MeTRC Grant.  When he refused, Plaintiff claims he was told that it did not matter

because the decision to remove him had already been finalized.

On March 3, 2010, Meharry sent a letter to the NIH formally requesting approval to remove Plaintiff as Co-PI on the MeTRC Grant. That letter, signed by Dr. Poland, Dr. Hildreth, and Dr. Peter J. Dolce, Meharry's Associate Vice-President for Research and Institutional Official for Grants and Contracts, stated:

> Some of the reasons for removing Dr. Al-Hendy as co-PI include issues related to leadership, conflicts of interest (real and perceived), ability to appropriately manage his areas of oversight, perseveration on issues (particularly those that were already resolved), inappropriate requests of staff, and communications with Meharry and MeTRC leadership and the NIH. Dr. Al-Hendy has been given the opportunity to withdraw from his role in the project voluntarily, but has declined to do so.

(Docket No. 41-3 at 82). The letter also requested approval for Defendant Hildreth to become sole PI on the MeTRC Grant, and for Dr. Bogdan Nowicki and Dr. Fernando Villalta to be deputy directors. On March 23, 2010, Meharry received a Revised Notice of Award for the MeTRC Grant, approving the changes in leadership.

After his removal as Co-PI on the MeTRC Grant, Plaintiff continued to perform his job responsibilities and duties as a researcher, clinician, and administrator at Meharry. Funding from the MeTRC Grant that supported his salary was replaced with institutional funds in an equal sum, such that Plaintiff's removal resulted in no reduction in his salary.

Based upon the foregoing, Plaintiff filed four Charges with the Equal Employment Opportunity Commission ("EEOC"). The substance of those charges are as follows:

> • The first Charge, dated September 15, 2010, claimed discrimination on the basis of national origin and religion, and retaliation. Plaintiff alleged that he was responsible for bringing the MeTRC Grant to Meharry but, after complaining to Dr. Poland (a "non Muslim/Middle Eastern") about "some scientific and financial violations of the grant," he was threatened by Dr. Poland that his contract with Meharry would not be renewed if he did not comply with the requests not to criticize Dr. Murray. Further, Plaintiff claimed that Dr. Poland made derogatory comments

about Plaintiff's Muslim faith and the treatment of women in Islam. Plaintiff also alleged that he was asked to resign as Co-PI because he was a "Muslim Arab" and that Dr. Poland commented that because Meharry was historically a Black college, the Board of Trustees preferred to have an African American faculty member at the helm of the grant and, thereafter, Dr. Hildreth (a "non-Muslim/Middle Eastern") became the only PI on the MeTRC Grant.

• The second Charge, dated October 2, 2010, alleged retaliation for the filing of the first Charge. Specifically, Plaintiff claimed that on September 16, 2010, Dr. Gloria Richard-Davis asked him to be Acting Chair of the Ob/gyn Department while she was on extended medical leave. Plaintiff was to assume those duties effective September 20, 2010. However, on September 21, 2010, Dr. Richard-Davis called Plaintiff and informed him that she was removing him, and that Associate Professors Ladson and Hills would be Acting Co-Chairs.

• The third Charge, dated October 25, 2011, also alleged retaliation. Plaintiff claimed that "unprecedented action" was being taken against him because he was terminated from an NIH-sponsored research project which he had created and for which he obtained funding. He also alleged that settlement funds had been misdirected from the Women's Center to the general endowment, which diminished his role as the Scientific Director and denied him incentive money in the amount of "approximately $12,000 to $40,000 under the Meharry incentive plan." He also claimed that restriction had been placed on his "human research" until he had received "additional training, continuing education and certification from an internationally recognized certification program."

• The fourth Charge, dated September 19, 2012, also alleged retaliation and "unprecedented actions." Specifically, Plaintiff claimed that he was denied a promotional opportunity to become the Executive Director of the Center for Women's Health because, even though Plaintiff was qualified and submitted the appropriate documentation, Dr. Charles P. Mouton, Dean of the School of Medicine, failed to submit Plaintiff's application to the search committee, even though Dr. Mouton claimed that he had.

(Docket Nos. 39-2, 39-3, 39-4 & 39-5).

The Amended Complaint contains both federal and state law claims. Plaintiff brings claims under Title VII, 42 U.S.C. § 2000e, *et. seq.*, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*, alleging that Meharry (1) unlawfully discriminated against him because of "national origin/ heritage which is Egyptian/Arabic and his religion which is Muslim";

(2) created a hostile work environment; and (3) retaliated against him for filing Charges with the EEOC.[1]  He also brings state law claims for (1) libel and slander based upon the March 3, 2010 letter to the NIH; (2) inducing breach of contract in violation of Tennessee Code § 47-50-109;  (3) tortious interference with contractual relations "either directly or as his being a third-party beneficiary concerning his position as co-principal investigator of the MeTRC Grant"; (4) breach of contract and tortious interference with contract; (5) "outrageous conduct and/or the deliberate infliction of emotional distress"; and (6) civil conspiracy.

## II.  <u>MOTION TO STRIKE</u>

In support of his Motion for Summary Judgment, Plaintiff has submitted a Declaration and Expert Opinion by William R. Herrington.  Defendants move to strike because, "in the face of Mr. Herrington's deposition testimony, [his] Declaration and Expert Opinion . . . are not reliable, will not assist the factfinder in understanding evidence, nor is Mr. Herrington qualified to give his opinion on the subject matter for which it is offered."  (Docket No. 49 at 2).

As this Court has pointed out in other cases, "motions to strike are generally disfavored and, rather than striking material, a court may ignore inadmissible evidence."  <u>Branch Banking & Trust Co. v. Fidelity Nat. Title Ins. Co.</u>, 2013 WL 6844653, at *5 (M.D. Tenn. Dec. 30, 2013) (collecting cases).  This case is a little different than most because Defendants are seeking to strike an expert's testimony, by invoking Rule 702 of the Federal Rules of Civil Procedure, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may

---

[1]  The Tennessee Supreme Court has repeatedly recognized that the Tennessee state legislature intended the THRA to be "coextensive with federal law," <u>Parker v. Warren County Util. Dist.</u>, 2 S.W.3d 170, 172 (Tenn. 1999), and, thus, the Court may look to Title VII, 42 U.S.C. § 2000e *et seq.* in analyzing Plaintiff's discrimination, hostile work environment, and retaliation claims, <u>see</u> <u>Carr v. United Parcel Serv.</u>, 955 SW.2d 832, 834-35 (Tenn. 1997).

testify in the form of an opinion or otherwise if[,]" among other requirements, the testimony "is based on sufficient facts and data" and "is the product of reliable principles and methods[.]" Fed. R. Evid. 702(b) & (c). However, Defendants do not focus on whether Mr. Herrington has sufficient knowledge and skill to render an expert opinion generally, but rather point to alleged inconsistencies between his deposition testimony and his Declaration and Expert Report.

For example, Defendants point to Mr. Herrington's deposition testimony that he had made no determination as to whether Plaintiff's removal was proper, but paragraph 2 of his Expert Opinion states that he has been retained to assist Plaintiff "in obtaining employment . . . and to offer expert testimony concerning the damage to his career and employment opportunity as a result of his being wrongfully terminated as a principal investigator on a major NIH grant." (Docket No. 35-2 at 1). Those statements suggest only that the Expert Opinion may have been inartfully drafted because Mr. Herrington is clearly not qualified, nor is he offered, to speak to the merits of Plaintiff's underlying claims. Rather, his testimony goes to the damages Plaintiff allegedly suffered.

Defendants also point out that in paragraph 4 of his Expert Opinion, Mr. Herrington states that he is "very familiar with policies and procedures concerning the selection and employment of medical professionals within the clinical environments, clinical research, and academic communities," id. at 2, but in his deposition testified that he does not focus on placing researchers. The fact that placing researchers is not Mr. Herrington's focus goes more to the weight of his proffered testimony than its admissibility.

Defendants also assert that Mr. Herrington admitted in his deposition that his knowledge of Plaintiff's removal from the MeTRC Grant came from Plaintiff and not the National Practitioner's Database and, therefore, Plaintiff's removal from the grant "is not available to the general public,

or to human resource professionals who are in the business of placing medical professionals." (Docket No. 50 at 4). This may be a *non-sequitur* because Mr. Herrington testified his firm is not a hiring authority and is "not allowed to access the National Physician Database." (Docket No. 51-1 at 22-23). Regardless, Dr. Herrington stated that Plaintiff's removal will surface during the interview process and it is better to bring the matter to the forefront early in the hiring process.

Defendants more generally assert that Mr. Herrington's opinion is based upon his own efforts to place Plaintiff and, as a consequence, he cannot offer his "knowledge or opinion as to how Plaintiff's removal from the MeTRC Grant would affect his application for a position independent of [Mr. Herrington's] assistance." (Docket No. 50 at 6). However, this ignores Mr. Herrington's deposition testimony that members of the National Association of Physician Recruiters would likely consider removal from a grant as a "red flag." It also ignores Mr. Herrington's background which he set forth in his Expert Opinion as follows:

> I have been involved in recruiting and placing physicians in practices both domestically and internationally since 1985 when I joined Health America, Inc., a Nashville based health maintenance organization (HMO) founded by Phil Bredesen. Over the past 28 years I have identified, attracted, analyzed and acquired thousands of physicians for my clients and have reviewed tens of thousands of physician curriculum vitaes (CV's) or resumes. My active data base contains over 24,000 physicians whose background and experience have been personally reviewed by me. I have placed physicians in clinical settings, academic settings and pharmaceutical and biotech research settings. I am very familiar with policies and procedures concerning the selection and employment of medical professionals within clinical environments, clinical research and academic institutions. I am familiar with the qualifications these institutions require of the varied medical professionals for which they are seeking, and I am familiar with the pay ranges for these varied medical positions.

(Docket No. 35-2 at 1-2).

The Court recognizes that it is Plaintiff's burden as the proponent of Mr. Herrington's testimony to establish its admissibility by a preponderance of the evidence, <u>Nelson v. Tennessee Gas</u>

Pipeline Co., 243 F.3d 244, 251 (6th Cir. 2001), and the Court is not making a definitive ruling on the admissibility of Mr. Herrington's testimony at trial. But this matter is presently before the Court on Defendants' Motion to Strike and they have not shown that Mr. Harrington's Declaration and Expert Opinion should be stricken based upon supposed inconsistencies with his deposition testimony. Therefore, Defendant's Motion to Strike will be denied.

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. Standards Governing Summary Judgment

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation," Ferro Corp. v. Cookson Group, PLC, 585 F.3d 946, 949 (6th Cir. 2009), except that "each motion is evaluated by reading the evidence and resolving any doubts in favor of the nonmovant," Shazor v. Prof. Transit Mgmt, Ltd. 744 F.3d 948, 955 (6th Cir. 2014). A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox Cnty School Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### B. Plaintiff's Motion for Partial Summary Judgment

Though titled a Motion for Partial Summary Judgment, Plaintiff moves for summary judgment on all of his substantive claims (though he does not address them all), presumably leaving

for consideration his request for damages. It is clear, however, that Plaintiff is not entitled to judgment of a matter of law on any of his claims.

Plaintiff contends that he is entitled to summary judgment on his claims under both Title VII and the THRA because of the existence of direct evidence showing discrimination. He argues that "the central contention of the Plaintiff is that the motivations [for] removing him from the MeTRC Grant administration favored employees not of his protected class," and that "an analysis of the events by the direct method of proof reveals that the Defendants openly discriminated against the Plaintiff by even segregating him from the other persons working on the administration of the MeTRC Grant." (Docket No. 32 at 5). Plaintiff then spends four pages on the "chronology of events leading up to the Defendants sending the March 3, 2010 letter to the NIH [that] reveal as self-evident the discriminatory intent of the Defendants." (Id. at 6).

A fundamental problem with all of Plaintiff's arguments is that the "facts" that he sets forth may or may not be true and are viewed entirely from his perspective. Moreover, the majority of the "facts" require analytical jumps to reach the conclusion that discrimination factored into Plaintiff's removal from the MeTRC Grant. Direct evidence, however, "does not require a factfinder to draw any inferences." Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003). Further, Dr. Poland denies the comments attributed to him by Plaintiff, so there are only allegations that the comments were made, not definitive proof. And even if Plaintiff had direct evidence, this does not mandate judgment in his favor because "[w]hen a plaintiff establishes a claim of discrimination through direct evidence, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.'" DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004).

As for indirect evidence, Plaintiff claims that he has "set forth undisputed facts in both his Declaration and Concise Statement of Material Fact that establishes [sic] that but for the allegations in the March 3, 2010 letter, he has always demonstrated leadership qualities that would be the envy of any professional." (Docket No. 32 at 11). Again, the facts that Plaintiff relies upon are not undisputed, and even if Plaintiff has demonstrated leadership qualities in other pursuits, this does not mean that he demonstrated leadership qualities in his handling of his duties as Co-PI on the MeTRC Grant. Moreover, as demonstrated by the March 3, 2010 letter, MeHarry's dissatisfaction was not limited Plaintiff's alleged lack of leadership abilities.

Plaintiff argues that "Meharry was quick to retaliate when on September 21, 2010, it abruptly and without explanation, removed [him] from the position of acting Chairperson of the Ob/Gyn Department [to] which he had just been appointed the day before." (Id. at 13). Plaintiff then sets forth a number of alleged retaliatory acts and then posits the question: "Given the Plaintiff's education, experience and background, how can anyone reasonably conclude that these events are anything but retaliation?" (Id. at 14). Such arguments, of course, fail to consider that Defendants have offered what they deemed to be legitimate reasons for their actions. For example, in regard to rescinding the offer to be acting Chairperson, Meharry asserts that Dr. Richard-Davis did not have the authority to appoint Plaintiff to that position. Further, and regardless of Plaintiff's education, experience, and background, "an employee bringing a Title VII retaliation claim must ultimately show 'that the desire to retaliate was the but-for cause of the challenged employment action.'" Bishop v. Ohio Dept. of Rehab. & Corr., 529 F. App'x 685, 695-96 (6th Cir. 2013) (quoting Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517 (2013)). Plaintiff has not made that "but-for" showing on the summary judgment record.

For primarily the same reasons set forth above, Plaintiff's Motion for Summary Judgment on his state law claims fails. He argues that he is entitled to summary judgment on his libel and slander claims because his "reputation has been damaged by the Defendants' false statement," (Docket No. 32 at 16), but this presupposes as established that the NIH letter contained falsehoods and that Plaintiff was actually harmed. He contends that summary judgment is appropriate on his inducement of contract claim but does not prove as a matter of fact or law that he possessed a contractual right in relation to the contract with NIH or that Defendants acted maliciously when they sent to the letter to the NIH. See, Givens v. Mullikin, 75 S.W.3d 383, 405 (Tenn.2002) (listing the seven elements for inducement to breach of contract including the requirement that "defendant acted with malice").

Plaintiff's Memorandum in support of his Motion for Summary Judgment contains ten rhetorical question which effectively ask, how could Plaintiff be treated the way that he was? The short answer is that the record does not conclusively establish that he was treated in a discriminatory, retaliatory, or otherwise unlawful way. Accordingly, Plaintiff is not entitled to summary judgment and his motion will be denied.

## C. **Defendant's Motion for Summary Judgment**

Defendants raise numerous arguments in support of their Motion for Summary Judgment. The Court discusses those arguments, generally in the order presented by Defendants.

### 1. **Jurisdiction Over Claims in Complaint**

Defendants assert that this Court lacks jurisdiction over two of the claims contained in Plaintiff's Amended Complaint, specifically, the claim of disparate treatment discrimination arising from Dr. Poland's removal of Plaintiff as supervisor of the PCIR in favor of Dr. Murray, and his

claim of national origin and religious discrimination relating to the alleged delay in transmitting his application for the Executive Director position. Defendants argue that neither claim was the subject of an EEOC charge.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The statute also makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" involving a discrimination charge. Id. § 20003-3. "However, before bringing suit under Title VII, a claimant must exhaust h[is] administrative remedies," which "serve[] to trigger an investigation [and] give[] notice to the employer of alleged wrongdoing." Crowder v. Railcrew Xpress, 557 F. App'x 487, 491 (6th Cir. 2014) (citing Scott v. Eastman Chem. Co., 275 F. App'x 466, 470–71 (6th Cir. 2008)).

Plaintiff's response only discusses his removal as a supervisor of the PCIR. He contends that his removal from the supervisory role "is part and parcel of [his] underlying claim that he faced discrimination in his removal as co-PI." (Docket No. 51 at 4).

The Court will allow this claim to go forward, albeit with the reservations expressed below. The exhaustion requirement "is not meant to be overly rigid, nor should it 'result in the restriction of subsequent complaints based on procedural technicalities or the failure of the charges to contain the exact wording which might be required in a judicial pleading.'" Randolph v. Ohio Dept. of Youth Serv., 453 F.3d 724, 732 (6th Cir. 2006) (quoting EEOC v. McCall Printing Co., 633 F.2d

1232, 1235 (6th Cir. 1980)).   "As a result, the EEOC complaint should be liberally construed to

encompass all claims 'reasonably expected to grow out of the charge of discrimination.'" Id.

(quoting Haithcock v. Frank, 958 F.2d 671, 675 (6th Cir. 1992)).

The September 15, 2010 Charge related to Plaintiff's removal from the MeTRC Grant and

alleged religious and national origin discrimination, and retaliation.  In the body of the Charge,

Plaintiff complained that he began to feel threatened and intimidated by Dr. Poland about the

potential non-renewal of his contract, and that he was instructed by Dr. Poland not to criticize Dr.

Murray.  While Plaintiff did not specifically allege facts related to his supervision of the PCIR, his

removal from that position would reasonably be expected to grow out of his allegations surrounding

his alleged mistreatment once Meharry received the MeTRC Grant.[2]

That said, the Court does not necessarily understand how this is an independent "claim."  As

noted, Plaintiff himself characterized his loss of the PCIR supervisory role as being "part and parcel"

of his claim relating to his removal as Co-PI.  If this is truly intended as an independent claim,

timeliness issues arise, because Plaintiff was required to file his EEOC Charge within 300 days of

the allegedly unlawful conduct, but he did not file the Charge until September 15, 2010, which is

306 days after he alleges that Dr. Poland sent the November 13, 2009 email removing Plaintiff from

his supervisory role over the PCIR.  Further, while the THRA does not contain Title VII's

administrative requirements and only requires that a discrimination charge be filed within a year,

that statute, like Title VII, requires as an element of Plaintiff's *prima facie* case, the showing of an

---

[2] In their reply, Defendants point out that in his original Complaint Plaintiff does not mention the
PCIR, Dr. Murray, or Plaintiff's removal as supervisor of any MeTRC Grant core.  Plaintiff does, however,
allege that "[f]rom the beginning . . . Dr. Poland and others at his direction began to obstruct and criticize
Plaintiff's administration of the grant" and that "[b]y February of 2010, it was obvious to Plaintiff that Dr.
Poland essentially ran the MeTRC grant because he continued to oppose and reverse all decisions of the
Plaintiff in the administration of the grant."  (Docket No. 1-1 at 13).

adverse employment action, <u>Gossett v. Tractor Supply Co., Inc.</u>, 320 S.W.3d 777, 380 (Tenn. 2010). Plaintiff has not made that showing independent of his removal as Co-PI. While the Court will not dismiss the PCIR "claim," it is an issue that may need to be addressed at the jury-charge conference.

Plaintiff's national origin and religious discrimination claim relating to the alleged delay in transmitting his application for the Executive Director position will be dismissed. Plaintiff did not respond to Defendants' argument on this score and the Charge he filed is clearly directed solely at alleged retaliation. In fact, Plaintiff does not even identify any comparators in the Charge or, more importantly, suggest that someone outside his protected class was placed in the position, both of which are essential for discrimination claims under Title VII and the THRA. <u>See Scola v. Publix Supermarkets, Inc.</u>, 557 F. App'x 458, 468 (6th Cir. 2014).

### 2. <u>Disparate Treatment</u>

"Disparate treatment occurs when an employer treats some employees less favorably than others because of race, religion, sex, or the like." <u>Hughley v. Gen. Motors Corp.</u>, 52 F.3d 1364, 1370 (6th Cir. 1995). "To base a claim on disparate treatment, the plaintiff must show discriminatory motive[.]" <u>Id</u>. This may be shown either through direct evidence or indirect evidence utilizing the burden-shifting paradigm of <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973), as refined by <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981).

Notwithstanding his arguments to the contrary, Plaintiff has presented no direct evidence of discrimination. As already noted in relation to Plaintiff's Motion for Partial Summary Judgment, the comments attributed to Dr. Poland are denied by him, and most (if not all) of the alleged comments do not "'require the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'" <u>Geiger v. Tower Automotive</u>, 579 F.3d 614, 620 (6th Cir. 2009)

(quoting <u>Wexler v. White's Fine Furniture, Inc.</u>, 317 F.3d 564, 570 (6th Cir. 2003)). The closest Plaintiff comes to presenting direct evidence is the alleged statement by Dr. Poland that Meharry favored Dr. Hildreth because it was a historically black institution. But Dr. Poland was not Plaintiff's supervisor, and President Riley was the decisionmaker in regard to Plaintiff's removal as Co-PI. "Any discriminatory statements must come from decisionmakers to constitute direct evidence of discrimination.'" <u>Id.</u> at 620–21. "Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, do not suffice to satisfy the plaintiff's burden to demonstrate animus." <u>Flones v. Beaumont Health Sys.</u>, 2014 WL 2497557, at *5 (6th Cir. June 14, 2014).

Under the indirect method of proof, Plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a similarly-situated person outside his protected class. <u>See</u> <u>Anthony v. BTR Auto Sealing Sys. Inc.</u>, 339 F.3d 506, 514 (6th Cir. 2003); <u>Clayton v. Meijer, Inc.</u>, 281 F.3d 605, 610 (6th Cir. 2002); <u>Mitchell v. Toledo Hosp.</u>, 964 F.2d 577, 582 (6th Cir. 1992). "After a plaintiff creates a presumption of discrimination by establishing a *prima facie* case, a defendant may rebut the presumption by proffering a legitimate, nondiscriminatory reason for its decision." <u>Dews v. A.B. Dick Co.</u>, 231 F.3d 1016, 1021 (6th Cir. 2000). If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual. <u>Id.</u> Although the burden of production shifts under the <u>McDonnell Douglas</u>/<u>Burdine</u> paradigm, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>DiCarlo</u>, 358 F.3d at 415 (6th Cir. 2004) (internal citation omitted).

In this case, Defendants argue that Plaintiff cannot establish a *prima facie* case of discrimination in relation to his removal as Co-PI because he cannot show an adverse employment action or a similarly-situated individual who was treated better. This Court disagrees, particularly since Plaintiff's burden at the *prima facie* stage is "not intended to be an onerous burden . . . but instead a burden which is easily met." White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008).

Turning to Defendants' first point, "[i]n the context of a Title VII discrimination claim, an adverse employment action is defined as a 'materially adverse change in the terms or conditions' of employment." Laster v. City of Kalamazoo, 746 F.3d 714, 727 (6th Cir. 2014) (quoting Kocsis v. Multi–Care Mgmt. Inc., 97 F.3d 876, 885 (6th Cir. 1996)). "An adverse employment action 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).

As Defendants point out, "[a] 'bruised ego' or a 'mere inconvenience or an alteration of job responsibilities' is not sufficient to constitute an adverse employment action." Spees v. James Marine, Inc., 617 F.3d 380, 391 (6th Cir. 2010) (quoting White v. Burlington N. & Santa Fe Ry. Co., 364 F.3d 789, 795 (6th Cir. 2004) (en banc)). And, "[t]rivial episodes of unpleasantness or admonition [or rudeness] standing alone, cannot supply legally sufficient evidence of actionable material discipline." Kelly v. Lambda Research, Inc. 89 F. App'x 535, 545 (6th Cir. 2004).

But Plaintiff's claim encompasses more than a bruised ego or hurt feelings. His claim is based upon his removal from a significant role in the most important grant that Meharry had ever received. He also contends that the loss of his role negatively impacted his marketability.

"'Prestige' and 'loss of title' can amount to adverse employment action under some circumstances." Freeman v. Potter, 200 F. App'x 439, 445 (6th Cir. 2006). Further, an employment action that limits future prospects can be adverse for purposes of the *prima facie* case. Wasek v. Arrow Energy Services, Inc., 682 F.3d 463, 470 (6th Cir. 2012); see also Jones v. City of Allen Park 167 F. App'x 398, 407 (6th Cir. 2006) (stating that being subjected to the punishment which hurts promotion prospects can be an adverse action) ; Freeman v. Potter, 200 F. App'x 439, 446 (6th Cir. 2006) ("The refusal to transfer, like an involuntary transfer, can amount to an adverse employment action if it significantly reduces the employee's career prospects.").

Defendants next argue that Plaintiff was not similarly situated to Dr. Hildreth because the latter did not cause the type of problems relating to the MeTRC Grant that Plaintiff did or show the same lack of leadership. However, the Sixth "Circuit holds that a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when it is analyzing the plaintiff's prima facie case," Schoonmaker v. Spartan Graphics Leasing, LLC, 595 F.3d 261, 264 (6th Cir. 2010), because "[t]o do so would bypass the burden-shifting analysis and deprive the plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination," Wexler, 317 F.3d at 575. Moreover, Defendants' argument takes as a given that Plaintiff agrees that his misconduct was as bad as they say; Plaintiff, of course, places an entirely different gloss on the key facts in dispute.

Turning to the remaining stages of the McDonnell Douglas/Burdine paradigm, Defendants have unquestionably presented a number of legitimate non-discriminatory reasons for removing Plaintiff as Co-PI. It therefore falls on Plaintiff to show that the stated reasons, including his alleged failure to get along and his lack of leadership, were pretextual.

Pretext may be shown by demonstrating "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the adverse employment action], or (3) that they were insufficient to motivate [the adverse employment action]." Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 460 (6th Cir. 2004). With respect to these avenues of proof, the Sixth Circuit has stated:

> The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are factually false. The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed "a suspicion of mendacity."

> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or a coverup.

Manzer v. Diamond Shamrock, 29 F.3d 1078, 1084 (6th Cir. 1994); accord Pennington v. Western Atlas, Inc., 202 F.3d 902 909-10 (6th Cir. 2000)).

Defendants argue that "the first and third showings are not available to this Plaintiff" because his "emails and testimony indicate that he does not dispute his behavior that President Riley and others found offensive, which resulted in his removal." (Docket No. 45 at 21). That seems to be a overly broad characterization of Plaintiff's testimony. Regardless, the Sixth Circuit has recently reiterated its observation that the three types of showings, while analytically helpful, are not meant

to be rigid and "'it is important to avoid formalism in its application, lest one lose the forest for the trees." Davis v. Cintas Corp., 717 F.3d 476, 492 (6th Cir. 2013) (quoting, Chen v. Dow Chemical Co., 580 F.3d 394, 400 n.4 (6th Cir. 2009)). After all, "'[p]retext is a commonsense inquiry: did the employer [take the adverse action against] the employee for the stated reason or not?" Id. "This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." Chen, 580 F.3d at 400 n.4. "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation." Id. "But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation." Id.

The summary judgment record does not definitively answer the question of whether Plaintiff was removed from his role as Co-PI for the reasons stated by Defendants because Plaintiff has produced some evidence that calls their explanation into question. This includes Dr. Poland's alleged statements, and in particular his statement that Meharry did not want someone who was not black to head a large grant. While Dr. Poland did not make the final decision to remove Plaintiff as a Co-PI, the evidence, when construed in Plaintiff's favor, suggests that Dr. Poland was heavily involved in the mix, including removing Plaintiff as a PCIR supervisor, being tasked with asking Plaintiff to resign as Co-PI, and being a signatory on the NIH letter.

Further, Plaintiff was allegedly removed for several reasons, including a lack of leadership abilities, the inability to appropriately manage, and the failure to get along with others. Yet following his removal as Co-PI, Plaintiff remained as Scientific Director of the RCMI Grant, remained as Principal Investigator on his own NIH research grant ("Targeting Adenovirus for Uterine Leiomyoma Gene Therapy"), and ran a joint grant between the United States Department

of Agriculture and the US-Egypt, Joint Board on Scientific and Technological Cooperation. Also, during the same period that Plaintiff was alleged to lack the traits necessary to be Co-PI on the MeTRC Grant, Dr. Dolce submitted applications for two other grants to the NIH on behalf of Plaintiff, and Dr. Poland wrote a letter in support of yet another application submitted by Plaintiff for an NIH grant.

The evidence relating to Plaintiff continuing in certain roles and being supported for other grants, of course, can cut in Defendants' favor because it suggest support for Plaintiff regardless of his national origin or religion. However, Plaintiff has presented enough to present a jury question regarding his removal as Co-PI, and it will be for the jury to weigh the evidence and determine credibility.

### 3. **Hostile Work Environment**

"To survive a motion for summary judgment on a hostile work environment claim, a plaintiff must establish: (1) the plaintiff was a member of a protected class, (2) the plaintiff was subjected to unwelcome harassment based on [religion] or national origin, (3) the harassment had the effect of unreasonably interfering with his work performance and creating an objectively intimidating, hostile, or offensive work environment, and (4) there exists some basis for liability on the part of the employer." Owhor v. St. John Health-Providence Hosp., 503 F. App'x 307, 312 (6th Cir. 2012) (citing Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 270 (6th Cir. 2009)). "The touchstone of any hostile work environment claim . . . is whether 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Khamati v. Sec'y of Dept. of the Treasury 557 F. App'x 434, 442 -43 (6th Cir. 2014) (quoting Harris v. Forklift

To determine whether workplace harassment is sufficiently severe or pervasive, the Court is to consider the "totality of the circumstances." Williams v. Gen.l Motors, 187 F.3d 553, 562 (6th Cir. 1999). The Court is also required to utilize both an objective and subjective test: "the conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard the environment as abusive." Bowman v. Shawnee State Univ., 220 F.3d 456, 462 (6th Cir. 2000). "Among the factors to be considered are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Clark v. United Parcel Serv., Inc., 400 F.3d 341, 352 (6th Cir. 2005) (quoting, Harris 510 U.S. at 23).

Plaintiff has failed to muster facts from which a reasonable jury could conclude from an objective perspective that, based upon the totality of the circumstances, he was subjected to a hostile or abusive work environment. He attributes only a handful of statements (primarily by Poland[3]) over a relatively short period of time, some of which were not even directed to him, and none of which were threatening. Although the inquiry is not subject to a "mathematically precise test," Harris, 510 U.S. at 22, and there is no bright line "'between a merely unpleasant working environment . . . and a hostile or deeply repugnant one,'" McPherson v. City of Waukegan, 379 F.3d 430, 438 (7th Cir. 2004) (citation omitted), the Court finds that Plaintiff has wholly failed to show that the conduct of which he complains was sufficiently severe or pervasive so as to alter the terms

---

[3] In addition to the handful of comments allegedly made by Dr. Poland, Plaintiff claims that Dr. Dolce once offered him a pastry knowing that, because of Ramadan, Plaintiff could not eat it.

and conditions of his employment.  See Primm v. Auction Broadcasting Co.,LLC, 2012 WL 13930, at *8 (M.D. Tenn. Jan. 12, 2012) (collecting numerous cases and finding no hostile work environment where comments were not physically threatening, some were not directed at plaintiff's protected status, and there were no more than a handful of statements over a relatively short period of time).

### 4. **Disparate Impact**

Defendants move for summary judgment on Plaintiff's disparate-impact claim, although it is unclear whether Plaintiff actually intended to plead such a claim.  While Plaintiff does alleged that Meharry has "an overarching policy of discrimination" against individuals because of their national origin/heritage . . .  and religion," (Docket No.  26 at 30), he does not support that allegation with underlying facts, nor has he responded to Defendant's Motion for Summary Judgment on this issue. Regardless, such a claim fails because

> [i]t is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is 'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.'

Campbell v. Hines, 2013 WL 7899224, at *4 (6th Cir. Aug. 8, 2013) (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 994 (1988)).

### 5. **Retaliation**

In the absence of direct evidence, retaliation claims are also subject to analysis under the McDonnell Douglas/Burdine burden-shifting framework.  Plaintiff has the initial burden of establishing the following essential elements:  "(1) he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the employee, and (4) there was a causal connection between the protected

activity and the adverse employment action." Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 720 (6th Cir. 2008).

Defendants forward arguments relating to each of the claims of alleged retaliation as set forth in Plaintiff's EEOC Charges. In response, Plaintiff directly addresses only the second Charge, and argues that, "[o]ther than the second retaliation complaint . . . Plaintiff would submit that his other retaliation claims create genuine issues of material fact as argued in his earlier filed Memorandum and therefore the Defendant's motion with respect to them should be denied." (Docket No. 52 at 7). Presumably, the "earlier filed Memorandum" was the one submitted in support of Plaintiff's own Motion for Summary Judgment, but all he does in that document is conclusorily assert that "[t]here is no dispute that the first three elements of a claim for retaliation are met by the Plaintiff," provides a one sentence description of each charge, and then asks, "[g]iven the Plaintiff's education, experience and background, how can anyone reasonably conclude that these events are anything but retaliation?" (Docket No. 32 at 14). This is hardly the type of response to a properly supported Motion for Summary Judgment contemplated by the Federal Rules of Civil Procedure or this Court's Local Rules. Regardless, the Court has reviewed the record and will dismiss Plaintiff's retaliation claims.

Plaintiff has not established the first element of a *prima facie* case with regard to his first EEOC charge. He claims Dr. Poland retaliated against him after Plaintiff questioned alleged financial and scientific irregularities relating to the grant. This is not protected activity. "'Protected activity' is classified as one of two things: (1) when an employee 'has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under [Title VII], the participation provision; or (2) when an employee has 'opposed any practice' made unlawful

under Title VII, the opposition provision." <u>Brown v. VHS of Michigan, Inc.</u>, 545 F. App'x 368, 373 (6th Cir. 2013) (quoting 42 U.S.C. § 2000e–3(a)).

With regard to the second Charge, Defendant argues that Plaintiff has not established the second element of a *prima facie* case because "Plaintiff admits that he has no competent evidence that either Dr. Mouton . . . Dr. Richard-Davis or any else at Meharry had knowledge on September 21, 2010 that he had filed a an EEOC Charge against Meharry on September 15, 2010." (Docket No. 45 at 38). In response, Plaintiff states that "he was told by the EEOC officer that she had informed Meharry officials about the pending complaint before it was filed." (Docket No. 52 at 6). This, as Defendants correctly note, is nothing but rank hearsay.

However, Plaintiff did file an internal grievance alleging national origin and religious discrimination, and an internal complaint alleging discrimination may be protected activity. <u>See</u> <u>Batuyong v. Gates</u>, 337 F. App'x 451, 461 (6th Cir. 2009). That said, the record is a bit murky as to whether Dr. Mouton was aware of the grievance when he contacted Dr. Richard-Davis. Ultimately, it does not matter because Defendants have offered a legitimate non-discriminatory reason: Dr. Richard-Davis did not have the authority to appoint an interim chair. Plaintiff has not provided any evidence which calls that reason into question. All Plaintiff relies upon is the temporal proximity of one day between the filing of the EEOC charge and his removal, but he points to no competent evidence that Meharry had knowledge of the filing of the Charge prior to Dr. Mouton's decision. Regardless, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." <u>Donald v. Sybra, Inc.</u>, 667 F.3d 757, 763 (6th Cir. 2012); <u>see</u> <u>also</u> <u>Seeger v. Cincinnati Bell Tel. Co.</u>, 681 F.3d 274, 284 (6th Cir. 2012) (citation omitted) ("Unlike its role in establishing a prima facie case, 'the law in this circuit is clear that temporal proximity cannot be the

sole basis for finding pretext.'").

With regard to the third and fourth Charges, Defendants assert that Plaintiff has not established an adverse action with respect to some of the allegations in those charges, and that, in any event, there are a number of legitimate non-discriminatory reasons for Meharry's decisions with respect to all of the allegations in those charges. They assert that Plaintiff cannot show an materially adverse action with respect to the distribution of settlement funds because he had no rights to any such funds, and cannot show an adverse action based upon Dr. Mouton's alleged failure to forward his application for Executive Director of the Women's Center. Further, Defendants assert that Meharry decided to (1) suspend the "Green Tea" study because of issues involving dosage error, placebo count, medication management, and questions over whether it had been maintained as a double-blind study; (2) place settlement funds in the general endowment rather than the Women's Center as seed funding to enhance recruitment for the next Executive Director of the Women's Center; (3) deny Plaintiff incentive funds under the Meharry plan because he did not qualify; (4) restrict Plaintiff's human research due to his need for additional training and certification; (5) withdraw an application for a second "Green Tea" study because it was duplicative of the first; and (6) appoint a pathologist (instead of a gynecologist like Plaintiff) as director of the Female Tissue Acquisition Core Study since the study was a pathology program that was consolidated into a larger pathology program.

In response to Defendants' Motion for Summary Judgment, Plaintiff has made no effort to challenge Defendants' arguments and the explanations for its decision. Even his response to Defendants' Statement of Facts and his "Final Declaration" do not specifically counter the reasons advanced by Defendants for their actions. Instead, Plaintiff generally asserts that certain things

happened and therefore those things must have been in retaliation for the filing of EEOC Charges. This is insufficient. The burden is on Plaintiff to establish a *prima facie* case (including showing a materially adverse action) and to provide some evidence which would suggest pretext once legitimate reasons for the employer's actions have been given. Plaintiff has simply not met this burden.

## 5. Libel/Defamation

Plaintiff libel/defamation claim is based upon the statement in the March 3, 2010 letter to the NIH about Plaintiff's alleged lack of leadership.

To establish defamation, "Plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." Shamblin v. Martinez, 2011 WL 1420896, at *3 (Tenn. Ct. App. April 13, 2011).

The issue of whether a statement is capable of a defamatory meaning is a question of law to be decided by the court. Memphis Publ'g Co. v. Nichols, 569 S.W.2d 412, 419 (Tenn. 1978) (citations omitted). In determining whether a statement is capable of a defamatory meaning, the "[a]llegedly defamatory statements should be judged within the context in which they are made" and given their usual meaning "as a person of ordinary intelligence would understand them in light of the surrounding circumstances." Revis v. McClean, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000). If the court determines that the statement or communication is not defamatory, then dismissal of the claim is appropriate; otherwise, it is for the jury to determine whether the statement was understood by its intended audience to be defamatory. See id.; Forsman v. Rouse, 2008 WL 2437644, at *3 (M.D. Tenn. 2008).

There is no dispute that NIH is the enabling organization that funds the MeTRC Grant, that the NIH is charged with overseeing the grant and requires periodic reports, that the comments made in the letter were specifically related to Plaintiff's performance, and that the letter was directed solely to the NIH and not otherwise published by Meharry. However, an employer is generally privileged to comment upon an employee's performance, see Sullivan v. Baptist Mem. Hosp., 995 S.W.2d 569, 574 (Tenn. 1999), and, "the dissemination of job performance reviews to supervisors is not a publication for purposes of defamation," Reinshagen v. PHP Co., Inc., 2001 WL 1422140, at *4 (Tenn. Ct. App. Nov. 14, 2011).

In any event, "a qualified privilege 'extends to all communications made in good faith upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty to a person having a corresponding interest or duty.'" Maynard v. Vanderbilt Univ., 1993 WL 156156, at *8 (Tenn. Ct. App. May 14, 1993) (quoting Southern Ice Co. v. Black, 135 Tenn. 391, 400-01 (Tenn. 1916)); see also Trotter v. Grand Lodge F. & A.M. of Tennessee, 2006 WL 538946, at *7 (Tenn. Ct. App. Mar. 6, 2006) (citing Southern Ice for the proposition that a "'conditional' or 'qualified' privilege exists with respect to communications where the interest which the defendant is seeking to vindicate or further is regarded as sufficiently important to justify some latitude for making mistakes"). "When a statement is qualifiedly or conditionally privileged it is not actionable, even though defamatory, absent actual or express malice." Parks v. Nelson, 2002 WL 523458, at *5 (Tenn. Ct. App. April 9, 2002). Plaintiff has made no showing that Defendants' statements about the alleged lack of leadership in relation to the MeTRC Grant were made with malice.

**6. Breach of Contract/Inducing Breach of Contract/Interference With Contract**

In support of his breach of contract claims, Plaintiff points to both the MeTRC Grant and his

employment contract.  Insofar as he is relying on the former, his claim fails because he is not a party

to the contract and, indeed, had no property interest in the MeTRC Grant:

> That a PI does not have a property interest in a grant is made clear by the
> governing regulations and the limited relevant caselaw that exists. It is the grantee
> institution (the College), and not the PI, that is the legal recipient of the grant . . . .
> Moreover, an NIH grant need not follow the PI in the event of a breakdown in the
> PI-grantee employment relationship. The grantee may replace the PI, with prior
> approval of the awarding agency. . . .
> In addition, NIH may terminate a grant with the consent of the grantee
> institution, without any requirement of PI input . . . . Indeed, NIH has the express
> authority to discontinue a grant at any time. . . .

Kalderon v. Finkelstein, 2010 WL 9488933, at *13 -14 (S.D.N.Y. Mar. 10, 2010) (internal citations

omitted); see also Huang v. Rector & Visitors of Univ. of Va., 2011 WL 6329755, at *14 (W.D. Va.

Dec. 19, 2011) (even though doctor "undoubtedly benefitted from NIH's disbursement of grant

funds," as the PI, he was not a third-party beneficiary to the contract between the NIH and the

university).[4]

On the other hand, Plaintiff did have an employment contract with Meharry.  To establish

a breach of contract claim, he must establish "(1) the existence of an enforceable contract, (2)

nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the

contract."  BancorpSouth v. Hatchel, 223 S.W.3d, 227 (Tenn. Ct. App. 2006).  "[T]here is implied

in every contract a duty of good faith and fair dealing in its performance and enforcement."  Dick

Broadcasting Co., Inc. of Tenn. v. Oak Ridge FM, Inc., 395 S.W.3d 653, 660 (Tenn.  2013).

Although "'[t]he duty of good faith . . . does not extend beyond the terms of the contract and the

reasonable expectations of the parties under the contract, [it] is a method of effectuating the parties'

---

[4]  Plaintiff points to language in the MeTRC Grant that describes the procedure for Meharry to
remove a PI.  That language, however, does not convey an intent by either the NIH or Meharry to confer any
rights to Plaintiff merely because he was a PI.

intent in unforeseen circumstances.  Further, a party may violate the covenant when it interprets the contract purposely in a way to prevent the other party from performing in a timely fashion or when a party conjures up a pretended dispute with its interpretation.'" SecurAmerica Bus. Credit v. Schledwitz, 2014 WL 1266121, at *26 (Tenn. Ct. App. Mar. 28, 2104) (quoting 21 Tenn. Prac. Contract Law and Practice § 8:33)).   In other words, "'there is an implied undertaking in every contract on the part of each party that he will not intentionally or purposely do anything . . . which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Winfree v. Educators Credit Union, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995) (quoting 7 Am. Jur. 2d Contracts § 256 (1964).

Given the observations this Court has made in relation to Plaintiff's discrimination claim surrounding his removal as Co-PI on the MeTRC Grant, the Court will allow his breach of employment contract claim to go forward, particularly since "the inquiry . . . is largely fact dependent." Dick Broad., 395 S.2.3d  at 670 n.24; see also Lamar Advertising Co. v. BY-Pass Partners, 313 S.W.3d 779,  780 (Tenn. Ct. App. 2009) ("Whether a party acted in good fair is a question of fact"); 23 Richard Williston on Contracts § 63:22 (4th ed.2002) ("[W]hether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact.").

The Court will not, however, allow Plaintiff's claims of inducing breach or tortious interference with contract to go forward because Tennessee law recognizes the unity of interest between employees acting within their authority and the corporation. See Waste Conversion Sys., Inc. v. Greenstone Indus., Inc., 33 S.W.3d 779, 782 (Tenn. 2000); Forrester v. Stockstill, 869 S.W.2d

328, 331-33 (Tenn. 1994).

## 7. **Outrageous Conduct**

The tort of outrageous conduct, also known as the intentional infliction of emotional distress, has three elements: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997). "Liability [for intentional infliction of emotional distress] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Id. "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'" Id. at 623.

Plaintiff has proffered nothing which comes close to supporting an outrageous conduct claim. In fact, in response to Defendants' Motion for Summary Judgment, he argues that the facts supporting his hostile work environment claims supports his outrageous conduct claim. Those "facts" are not enough to present a jury question for either claim.

## 9. **Civil Conspiracy**

Finally, the Court will dismiss Plaintiff's civil conspiracy claim for three reasons. First, he has filed no response arguments in relation to this claim. Second, "[a] civil conspiracy 'requires an underlying predicate tort allegedly committed pursuant to the conspiracy,'" Davis v. Covenant Presbyterian Church, 2014 WL 2895898, at *8 (Tenn. Ct. App. June 23, 2014) (quoting Watson's Carpet & Floor Coverings, Inc. v. McCormick, 247 S.W.3d 169, 186 (Tenn. Ct. App. 2007)), and

the Court is dismissing Plaintiff's tort claims.  Third, the Tennessee Supreme Court has held "that there can be no actionable claim of conspiracy where the conspiratorial conduct alleged is essentially a single act by a single corporation acting through its officers, directors, employees, and other agents, each acting within the scope of his or her employment."  Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 703-04 (Tenn. 2002).

### III. CONCLUSION

On the basis of the foregoing, Defendants' Motion to Strike will be denied, as will Plaintiff's Motion for Summary Judgment.  Defendants' Motion for Summary Judgment will be granted except with respect to Plaintiff's discrimination claim(s) arising from his removal as Co-PI on the MeTRC grant and his claim based upon the alleged breach of the covenant of good faith and fair dealing in relation to his employment contract with Meharry.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE